FILED '05 FEB 07 12:56 USDC-ORP

# UNITED STATES DISTRICT COURTS
## DISTRICT OF OREGON
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | NO. CR 04-469-KI  (D. Or.) |
| Plaintiff, | ) | NO. CR 04-531-KI  (C.D. Cal.) |
| v. | ) | |
| | ) | |
| FUJITRANS CORPORATION | ) | PLEA AGREEMENT |
| | ) | |
| Defendants. | ) | |
| | ) | |

The United States of America, by and through Karin J. Immergut, United States Attorney for the District of Oregon, Robert Ross and Scott Kerin, Assistant United States Attorneys for this district; Debra W. Yang, United States Attorney for the Central District of California, and

William W. Carter, Assistant United States Attorney for this district; the United States Department of Justice, Environmental Crimes Section, through Trial Attorney Richard Poole, and Defendant Fujitrans Corporation (hereafter "Fujitrans" or "defendant") and Kagoshima Senpaku Kaisha, Ltd., (hereafter "Kagoshima"), by and through their attorney, Kenneth Lerner, hereby enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11:

    1.    <u>Waiver of Indictment</u>. Defendant, having been advised of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charges brought by Informations filed in the Central District of California and the District of Oregon.

    2.    <u>Waiver of Venue and Transfer To District of Oregon.</u> Defendant agrees to waive venue on the Information filed in the Central District of California and consents to the transfer of the Information to the District of Oregon under Federal Rule of Criminal Procedure 20 for entry of plea and sentencing.

    3.    <u>The Charges</u>. Defendant, by and through its authorized representatives, having been advised of the right to have this matter tried before a jury, agrees to waive that right and enter pleas of guilty to the counts contained in the Information filed in the District of Oregon and the Information filed in the Central District of California. By entering these pleas of guilty, defendant hereby waives all objections to the form of the charging documents.

    4.    <u>Elements of the Offenses</u>.  To establish liability for the charged offense of violating the Act to Prevent Pollution from Ships as charged in the Informations, in violation of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Sections 151.25(a), (d) and (h), the Districts must prove that the Defendant, by and through the actions of its agents and/or employees, knowingly failed to maintain an Oil Record Book in which all disposals of oil residue and all overboard discharges and disposals of bilge water were

fully recorded. Under well-established principles of corporate liability and *respondeat superior*, as these principles apply in this case, the corporate defendant is liable for the actions of its agents and employees acting within the scope of their employment. *New York Central and Hudson River R.R. v. United States*, 212 U.S. 481, 495 (1909); *United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979); *United States v. Hilton Hotels Corporation*, 467 F.2d 1004-1007 (9th Cir. 1972).

     5.     <u>The Penalties</u>. Defendant understands that the statutory penalties applicable to a corporate defendant for the offense of knowingly failing to maintain an accurate Oil Record Book in violation of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Sections 151.25(a), (d) and (h), as charged in the Informations are as follows: a maximum fine of up to $500,000 per count, a term of probation of up to 5 years, and a special assessment of $400 per count.

Fujitrans agrees that should the Court accept the terms of this Plea Agreement, the monetary penalty imposed by the Court consistent with this Agreement, including the special assessments and the fines, shall be paid on the date of sentencing.

     6.     <u>Rights Waived by Pleading Guilty</u>. Defendant understands that, by pleading guilty, it knowingly and voluntarily waives the following rights:

     a.     The right to plead not guilty, and to persist in a plea of not guilty;

     b.     The right to a speedy and public trial before an impartial jury;

     c.     The right to the effective assistance of counsel at trial;

     d.     The right to be presumed innocent until guilt has been established at trial, beyond a reasonable doubt;

     e.     The right to confront and cross-examine witnesses against it at trial;

     f.     The right to compel or subpoena witnesses to appear on its behalf at trial; and

     g.     The right to appeal a finding of guilt or any pretrial rulings.

7.      Applicability of Sentencing Guidelines. Defendant understands and acknowledges that pursuant to USSG §§ 8C2.1, Chapter 8 of the United States Sentencing Guidelines is not applicable to the determination of the appropriate fine in this case.

8.      Sentencing Agreement. The parties agree that they will recommend that the court impose the following sentence. This recommendation is made under Federal Rule of Criminal Procedure 11(c)(1)(A) and (B). The court is not bound by the recommendation of the parties.

  a.      Fine. Fujitrans shall pay $335,000 on each of the 3 counts in the Information filed in the District of Oregon, for a total of $1,005,000, and $335,000 on the count in the Information filed in the Central District of California, due and payable in accordance with paragraph 5 above.

  b.      Mandatory Special Assessment. Defendant shall pay a special assessment of $400 on each of the 4 counts, due and payable in accordance with paragraph 5 above.

  c.      Probation. Defendant will be placed on organizational probation for a period of 3 years pursuant to USSG §§ 8D1.1 and 8D1.2. The terms of probation shall be:

    (1)      No Further Violations. Defendant agrees that it shall commit no further violations of federal, state or local law, including those laws and regulations for which primary enforcement has been delegated to state authorities, and shall conduct all its operations in accordance with the MARPOL Protocol.

    (2)      Environmental Management System/Compliance Plan. Consistent with the sentencing policies set forth in USSG § 8D1.4, defendant and Kagoshima agree to develop, adopt, implement and fund the Environmental Management System/Compliance Plan ("EMS") attached hereto as Exhibit A. Kagoshima is a corporation that is wholly owned by defendant Fujitrans, for the purpose of conducting fleet operations of

ships formerly managed by Fujitrans. It is expressly understood that Fujitrans may be held liable for any violations of this plea agreement and the EMS by Kagoshima.

The EMS will establish that: all environmental and related operational risks have been identified; such risks are being appropriately managed and potential risks are being avoided; all international, federal, state and local laws, regulations, and environmental permit requirements are being adhered to; appropriate policies, programs and procedures are in place; organizational responsibilities are clearly defined, understood and implemented; environmental quality control assurance and verification systems are in place, as determined by appropriate self-policing and third-party audits; company operations, including contractor operations and on-site service provider operations, do not present actual risks to the environment. Defendant and Kagoshima shall ensure that the environmental compliance program is diligently enforced by their officers and managers.

Defendant shall be responsible for all costs associated with the development, implementation, maintenance and monitoring of the EMS.

Defendant and Kagoshima agree that during the period of probation, and at all reasonable times and with as reasonable prior notice by the Districts as practicable, they will provide the Districts with full access to its vessels listed in the EMS, as well as all facilities, employees, and records that are relevant to monitoring compliance with the terms and conditions of the EMS.

If either defendant or Kagoshima change their name, the renamed company shall be obliged to meet all of the obligations of defendant and/or Kagoshima under this agreement. If either defendant or Kagoshima merges with another company through a stock or asset purchase, the newly created or merged company shall be obliged to meet all of the obligations of defendant and/or Kagoshima under this agreement with regard to those vessels managed by defendant or Kagoshima at the date of the merger.

The parties recognize that during the term of probation, the number and identity of vessels managed by defendant or Kagoshima that call in the Districts may increase or decrease. Any vessel the management of which is assumed by defendant or Kagoshima and which calls in the United States shall be included within the scope of its EMS. Any vessel removed from management by defendant or Kagoshima or which stops calling in the United States shall be excluded from the scope of its EMS.

        d.    <u>Community Service</u>.  The parties agree that the court should impose a condition of community service pursuant to USSG § 8B1.3 and in furtherance of the sentencing principles provided in 18 U.S.C. § 3553(a), for the purpose of funding one or more projects for the benefit, preservation, and restoration of the environment and ecosystems in the waters of the United States in the District of Oregon and the Central District of California. The community service shall consist of payments of $495,000 in the District of Oregon and $165,000 in the Central District of California. The payment in the District of Oregon shall be made to the National Fish and Wildlife Foundation, for the benefit of the Columbia River Coastal and Estuarine Fund, and in the Central District of California to the Channel Islands National Park of the United States National Park Service, located in Ventura, California. The payment to the Channel Islands National Park shall be for environmental programs which may include but not be limited to staff housing on Santa Cruz Island and law enforcement and patrol operations, such as enhanced enforcement of Marine Protected Areas .

        9.    <u>Application of the Agreement</u>.  This Agreement shall bind defendant , Kagoshima and such other companies as may be included in paragraph 8, above, or the attached Exhibit A. Defendant and Kagoshima shall provide the Districts and the United States Probation Office with immediate notice of any name change, business reorganization, sale or divestiture impacting their ability to pay the fine or affecting this Agreement and the EMS. Defendant and

Kagoshima shall not engage in any action to seek to avoid the obligations and conditions set forth in this Agreement.

  10. <u>Statement of Facts</u>. The government and the defendant agree that the government would offer proof of the following facts at trial and in support of defendant's guilty pleas. Defendant admits that it is guilty of Counts 1, 2 and 3 as charged in the Information filed in the District of Oregon, and Count 1 in the Information filed in the Central District of California based on these facts.

  *A. Background*

  1. Defendant is a transportation facilitation company incorporated and headquartered in Japan. Acting both directly and through its agents, the Defendant managed a fleet of approximately 27 ships, that transported automobiles and other cargos around the world. Since the events leading to the charges in this case, Defendant has formed a new subsidiary Kagoshima, to manage its fleet of ships.

  2. One of the marine vessels the Defendant operated and managed is the motor vessel (M/V) Cygnus, a Panamanian flagged freight ship weighing 44,356 gross tons owned by Feng Li Maritime Corporation, a Panama corporation. Over the last several years, the M/V Cygnus has made a number of port calls in the United States, including ports in the District of Oregon and the Central District of California.

  3. The M/V Cygnus typically operates with a crew of approximately twenty-three (23) persons. Approximately nine crew members of different rank work in the vessel's engine room, including a chief engineer, a first engineer, a second engineer, a third engineer, an electrician, a motorman, two oilers, and a wiper. During the period relevant to this Plea Agreement, the first engineer was primarily responsible for properly disposing of waste oil that accumulated onboard the vessel and was responsible for operating the vessel's Oil Water Separator ("OWS") and incinerator. The first engineer reported to the chief engineer who had overall responsibility for engine room operations. The chief engineer reported directly to the captain, who was responsible for all vessel operations.

  4. Large ocean going vessels, like the M/V Cygnus, produce waste oil as a result of the operation of machinery in the engine room. Some of the waste oil, together with water and other liquids, accumulates in the bottom or "bilges" of the vessel. The bilge waste is collected and run through various processes designed to separate the oil and other wastes from the water. These processes include settling tanks, an OWS, a pollution control device designed to separate the oil from the water. After processing by the OWS, bilge water containing very small amounts of oil may be legally discharged overboard. Oil removed from the bilge waste, along with other waste oils from the ship, are stored in a sludge tank. Some ships burn the sludge in an incinerator or in the vessel's auxiliary boiler. Oil-contaminated bilge waste and other waste oils,

including sludge, may also be off-loaded while the vessel is in port and properly disposed of onshore.

    5.      Under the MARPOL Protocol, an international treaty implemented in the United States by the "Act to Prevent Pollution from Ships" ("APPS"), 33 U.S.C. 1901, *et seq.,* a ship may not discharge overboard oily waste with more than fifteen (15) parts per million ("ppm") of oil. The MARPOL Protocol and the APPS require that each oil tanker of 150 gross tons or more, or non-tanker vessels of more than 400 gross tons, maintain an "Oil Record Book" (also known as the "ORB"). All transfers of oil, disposal of sludge and bilge water, and overboard discharges of bilge water that have accumulated in machinery spaces and are thus contaminated with oil, must be fully recorded in the ORB. 33 C.F.R. § 151.25(d). The captain of the ship must sign every completed page of the ORB. 33 C.F.R. § 151.25(h). The ORB must be maintained onboard for not less than three years and must be kept on board the vessel readily available for inspection at all reasonable times.

    6. The regulations authorize the U.S. Coast Guard to board and inspect all vessels in United States ports to determine compliance with federal regulations and the MARPOL Protocol. 14 U.S.C. § 89, 33 C.F.R. § 151.23. The inspection typically includes an examination of the ORB. The U.S. Coast Guard relies upon the accuracy of information contained in the ORB to assist in assessing the vessel operator's compliance with all applicable rules and regulations.

    *B. Factual Basis For Plea*

    On or about March 31, 2002, a former crew member of the M/V Cygnus sent an email to authorities in the United States from his home in the Phillippines. He alleged that the ship was illegally discharging its oily wastes through a bypass hose that connected from the sludge pump to the overboard valve of the OWS, thus bypassing the OWS. In the email he attached photographs of the bypass hose in place. He said that proof of the use of the bypass hose and falsification of the ORB could be determined by looking at the entries in the Manned Zero Checklist.

    On April 10, 2002, when the MV Cygnus arrived in the Port of Portland, the United States Coast Guard executed a search warrant. During the execution of the warrant, the Coast Guard found a bypass hose that was depicted in the photographs previously sent. It also found that there was oil residue in the hose. The Coast Guard found that the overboard valve of the OWS was contaminated with oil. The Coast Guard found that the ship's incinerator appeared to be inoperable. The sensor that activates the 3-way valve when the oil content of bilge discharge exceeds 15 ppm was inoperable. The side of the ship behind the overboard discharge valve had a wide streak of oil.

    The Coast Guard inspected the Manned Zero Checklist. This is a safety checklist that is done daily before the engine room goes on unmanned status at night. In it, the content levels of the sludge tanks and waste oil tanks are recorded as is the temperature of the waste oil tank (which feeds the incinerator). The waste oil tank showed the same level every day, indicating none of it was burned in the incinerator. The waste oil tank temperature was room temperature, far below the 80-90 degrees Celsius required to operate the incinerator. The waste oil tank contained diesel fuel and not sludge.

Various members of the crew made statements to the government, admitting that the ship discharged its oily wastes overboard through a bypass hose and did not burn the sludge in the incinerator. The Chief Engineer admitted that he falsified entries in the ORB to cover up the illegal discharges of oily wastes into the ocean.

On August 13, 2001, the M/V Cygnus entered the Port of Portland. The U.S. Coast Guard conducted a Port State Control inspection and as part of that inspection reviewed the ship's ORB. The ORB showed that the ship disposed of its oily wastes by burning in the incinerator, and that any discharges of bilge water were after treatment in the OWS and the discharges were less than 15 ppm oil content. Engine room crew members of the ship, during the search warrant executed in April 2002, stated that had been told by their predecessors on board the M/V Cygnus during the August 2001 visit of the ship to Portland, that the ship did not use the incinerator to dispose of oily wastes, but rather discharged it at sea. The analysis of the tank levels in the engine room records showed that the incinerator tank was not used, and that the waste oil was discharged overboard.

On or about September 14, 2001, the M/V Cygnus entered the Port of Portland. The ship's ORB was available for inspection, but had not accurately recorded all transfers and disposals of oily wastes and did not accurately record all discharges of bilge water. The ship's ORB recorded that in the week prior to entering the Port of Portland, the ship burned oily wastes in the incinerator every day. Analysis of other engine room records showed that the waste oil tank levels remained constant and the waste oil tank contents were not heated but at room temperature. One of the engine room officers who was on duty during that voyage stated that the incinerator was not used and that the oily wastes were discharged overboard.

On or about September 25, 2000, the M/V Cygnus entered the Port of Long Beach. The ship's ORB was ready and available for inspection, but had not accurately recorded all transfers and disposals of oily wastes and did not accurately record all discharges of bilge water. The ship's ORB recorded that the ship routinely disposed of its oily wastes through the ship's incinerator, recording six such disposals on the voyage from Japan to Portland and two such disposals on the voyage from Portland to Long Beach. However, the other engine room records showed that the tank level of the waste oil tank remained constant and full, and that the tank was not heated, which is necessary for incinerator operation. One of the engine room officers who was on board during the search of the M/V Cygnus in April of 2002 stated that his predecessor, who was on board during September of 2000, told him that the ship did not use the incinerator to dispose of oily wastes, as the oily wastes were discharged overboard.

11.  <u>Non-Prosecution of Additional Offenses</u>.  As part of this Plea Agreement and solely because of the promises made by defendant and Kagoshima, the Districts agree not to prosecute defendant for any additional pollution offenses or related false statement or obstruction of justice offenses before the date of this agreement which are known to the

government, and agree not to prosecute Fujitrans USA, Feng Li Maritime Corporation or Toyofuji Shipping Co., Ltd., for any of the conduct that is the subject of this investigation.

Nothing contained in this Agreement is meant to limit the rights and authority of the United States to take further civil or administrative action against defendant, including but not limited to, any listing and debarment proceedings to restrict rights and opportunities of defendant or Kagoshima to contract with or receive assistance, loans, and benefits from United States agencies.

This Plea Agreement does not limit the right of defendant or the United States to speak at the time of sentencing or in connection with any presentence investigation, consistent with the provisions set forth in this Plea Agreement, or to provide the Court or the United States Probation Office with evidence of all relevant conduct committed by defendant. The parties agree that at sentencing each will support the agreed disposition set forth in this Plea Agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and (B).

12.   Award to Informant. The government will recommend, and defendant will not oppose, that the court award a portion of the criminal fine to the person who gave information leading to the convictions in this plea agreement, pursuant to 33, U.S.C. § 1908(a).

13.   Corporate Authorization. Defendant and Kagoshima represent that they are authorized to enter into this Agreement. On or before the date of entry and filing of the Plea Agreement, defendant and Kagoshima each shall provide to the Districts and the Court a written statement under corporate seal or with notary's verification of signature, certifying that they are authorized to enter into and comply with all of the provisions of this Plea Agreement. The resolutions further shall authorize their counsel to take these actions, and that all corporate formalities for such authorizations have been observed.

14.   <u>Waiver of Appeal</u>. Defendant is aware that 18 U.S.C. § 3742 gives the right to appeal the sentence to be imposed, and that other federal statutes give defendant the right to appeal other aspects of the conviction. In consideration of the agreement of the Districts as set forth herein, Fujitrans knowingly and voluntarily agrees to waive the following rights:

a.   The right, conferred by 18 U.S.C. § 3742, to appeal any sentence imposed by the Court for the conviction of these offenses, except if the sentence imposed varies from that agreed upon above under Rule 11(c)(1)(A);

b.   The right to appeal any aspect of defendant's conviction, including any pre-charge or pre-trial dispositions of motions or other issues; and

c.   The right to bring any collateral attack against defendant's conviction or sentence, except as it may relate to the effectiveness of its legal representation or as permitted under subparagraph (a) above.

15.   <u>Voluntariness of the Plea</u>. Defendant acknowledges that it has entered into this Plea Agreement freely and voluntarily and that it has been fully advised by counsel, and that no threats or promises were made to induce it to enter into the guilty pleas called for by this Agreement.

16.   <u>Statute of Limitations</u>. In the event that this Agreement is not accepted by the Court for any reason, or defendant or Kagoshima has breached any of the terms of this Plea Agreement, the statute of limitations as to defendant shall be deemed to have been tolled from the date of the Plea Agreement to: (1) 30 days following the date of non-acceptance of the Plea Agreement by the Court; or (2) 30 days following the date on which a breach of the Plea Agreement by defendant or Kagoshima is discovered by the Districts.

17.  **Completeness of Agreement.** The Districts and defendants acknowledge that these terms constitute the entire Plea Agreement between the parties. This Agreement only binds the United States Attorney's Offices for the District of Oregon and the Central District of California, and the United States Department of Justice, Environmental Crimes Section. It does not bind any other United States Attorney's Office or any other office or agency of the United States, or any state or local prosecutor, except as provided herein.

**FOR THE UNITED STATES:**
KARIN J. IMMERGUT
United States Attorney

_____ 10-1-04
ROBERT B. ROSS
Assistant United States Attorney
District of Oregon

DEBRA W. YANG
United States Attorney

_____ 10/8/04
WILLIAM W. CARTER
Assistant United States Attorney
Central District of California

_____ 10/7/04
RICHARD POOLE
Senior Trial Attorney
Environmental Crimes Section
United States Department of Justice

**FOR THE DEFENDANT:**

_____ 10-1-04
KENNETH LERNER
Attorney For Fujitrans Corporation

_____ 10-1-04
KENNETH LERNER
Attorney for
Kagoshima Senpaku Kaisha, Ltd